## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) ALICIA D. COULTER,<br><br>    **Plaintiff,**<br><br>vs.<br><br>(1) CITY OF STILLWATER, OKLAHOMA,<br>(2) JOSHUA DYLAN GOMEZ,<br>(3) RONALD DARYLE GEE,<br>(4) ALONZO JESUS CORDOVA, JR.,<br>(5) LIONARD SAMGWA'A FOMBE,<br>(6) SAMUEL GAGE WESTCOTT,<br>(7) BRANT RICHARD SPARKS, and<br>(8) GEMMA E. ANDRADE AGUILERA,<br><br>    **Defendants.** | **Case No. CV-**<br><br>**COMPLAINT**<br><br>**ATTORNEY LIEN CLAIMED**<br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Alicia D. Coulter ("Ms. Coulter" or "Plaintiff"), by and through her attorney, Matthew J. Primm of Haven Law Group PLLC, for her Complaint against the Defendants, states and avers as follows:

### INTRODUCTION

1. This is a civil rights case about the institutionalized weaponization of strip search against women by the Stillwater Police Department. After Alicia D. Coulter was assaulted, falsely arrested, and denied medical care by Stillwater Police Department Officers, she was subjected to a punitive strip search at the Stillwater County Jail—carried out mostly by male officers and detention staff—as punishment for asserting her right to medical treatment and the right to remain silent. Ms. Coulter brings this action to hold the responsible officers and the City of Stillwater accountable for these constitutional violations.

1

**PARTIES, JURISDICTION, AND VENUE**

2.      Plaintiff is a resident of Davis County, Utah.

3.      Defendant City of Stillwater, Oklahoma ("City") is a municipality located in Payne County, Oklahoma. The City provides and employs the Stillwater Police Department.

4.      Defendant Joshua Dylan Gomez ("Officer Gomez") was, at all pertinent times, an officer in the Stillwater Police Department ("SPD"), employed by Defendant City of Stillwater. At all pertinent times, Officer Gomez was acting within the scope of his employment and under color of state law. Based upon information and belief, Officer Gomez was a resident of Payne County, Oklahoma, at the time of the incidents described herein. Officer Gomez committed underlying violations of Ms. Coulter's constitutional rights, explained below in more detail.

5.      Defendant Ronald Daryle Gee ("Supervisor Gee") was, at all pertinent times, a supervisory officer in the Stillwater Police Department, employed by Defendant City of Stillwater, At all pertinent times, Supervisor Gee was acting within the scope of his employment and under color of state law. Based upon information and belief, Supervisor Gee was a resident of Payne County, Oklahoma, at the time of the incidents described herein. Supervisor Gee committed underlying violations of Ms. Coulter's constitutional rights, explained below in more detail.

6.      Defendant Alonzo Jesus Cordova, Jr. ("Officer Cordova") was at all pertinent times, an officer in the Stillwater Police Department ("SPD"), employed by Defendant City of Stillwater. At all pertinent times, Officer Cordova was acting within the scope of his employment and under color of state law. Based upon information and belief, Officer Cordova was a resident of Payne County, Oklahoma, at the time of the incidents described herein. Officer Cordova committed underlying violations of Ms. Coulter's constitutional rights, explained below in more detail.

7.      Defendant Lionard Samgwa'a Fombe ("Officer Fombe") was at all pertinent times, an officer in the Stillwater Police Department ("SPD"), employed by Defendant City of Stillwater. At all pertinent times, Officer Fombe was acting within the scope of his employment and under color of state law. Based upon information and belief, Officer Fombe was a resident of Payne County, Oklahoma, at the time of the incidents described herein. Officer Fombe committed underlying violations of Ms. Coulter's constitutional rights, explained below in more detail.

8.      Defendant Samuel Gage Westcott ("DO Westcott") was at all pertinent times, a detention officer working in the Stillwater City Jail ("Jail") employed by Defendant City of Stillwater. At all pertinent times, DO Westcott was acting within the scope of his employment and under color of state law. Based upon information and belief, DO Westcott was a resident of Payne County, Oklahoma, at the time of the incidents described herein. DO Westcott committed underlying violations of Ms. Coulter's constitutional rights, explained below in more detail.

9.      Defendant Brant Richard Sparks ("DO Sparks") was at all pertinent times, a detention officer working in the Stillwater City Jail ("Jail") employed by Defendant City of Stillwater. At all pertinent times, DO Sparks was acting within the scope of his employment and under color of state law. Based upon information and belief, DO Sparks was a resident of Payne County, Oklahoma, at the time of the incidents described herein. DO Sparks committed underlying violations of Ms. Coulter's constitutional rights, explained below in more detail.

10.     Defendant Gemma Esmerelda Andrade Aguilera ("DO Aguilera") was at all pertinent times, a detention officer working in the Stillwater City Jail ("Jail") employed by Defendant City of Stillwater. At all pertinent times, DO Aguilera was acting within the scope of her employment and under color of state law. Based upon information and belief, DO Aguilera was a resident of Payne County, Oklahoma, at the time of the incidents described herein. DO

3

Aguilera committed underlying violations of Ms. Coulter's constitutional rights, explained below in more detail.

11.    The jurisdiction of the Court is invoked pursuant to 28 U.S.C. §1343 to secure protection of and to redress deprivations of rights secured by the Fourth and Fourteenth Amendments to the United States Constitution as enforced by 42 U.S.C. §1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under colors of law.

12.    The jurisdiction of this Court is also invoked under 28 U.S.C. §1331 to resolve a controversy arising under the Constitution and the laws of the United States, particularly the Fourth and/or Fourteenth Amendments to the United States Constitution and 42 U.S.C. §1983.

13.    Venue is proper under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to Ms. Coulter's claims occurred in this judicial district.

**FACTUAL ALLEGATIONS**

14.    On or about May 26, 2023, at approximately 1:15 a.m., Ms. Coulter, an African American woman, was present at or near the entrance of Willie's Saloon ("Willie's"), located at 323 S. Washington Street, Stillwater, Oklahoma, within the city limits of Stillwater.

15.    At that time, Ms. Coulter was on the ground having been attacked by a then-unknown assailant. This assailant repeatedly struck Ms. Coulter in the mouth with a closed fist several times while simultaneously pulling her hair, as she lay in the fetal position on the ground. Ms. Coulter had not initiated or provoked any physical confrontation.

16.    Defendant Officer Gomez arrived at the scene in a marked SPD vehicle and approached Willie's on foot. Officer Gomez witnessed Ms. Coulter being attacked. Officer Gomez

4

intentionally or inadvertently aided the assailant in fleeing by directing the assailant away from the scene. The assailant ran further into Willie's.

17.    After the assailant fled, Officer Gomez picked up Ms. Coulter from the ground. While doing so, Officer Gomez asked Ms. Coulter about the altercation. She responded "I was attacked." However, Officer Gomez falsely stated "You were on top of her." Officer Gomez's body camera footage clearly shows the assailant standing over and striking Ms. Coulter who was on the ground defending herself.

18.    Upon information and belief, the assailant was friends with staff from Willie's. For this reason, at least one staff member told officers that Ms. Coulter had been the aggressor—despite the video footage clearly showing otherwise. Additionally, it is believed that unknown members of Willie's staff assisted the assailant in avoiding detection when officers made a cursory search for her inside.

19.    Officer Gomez then placed Ms. Coulter—a non-violent, non-threatening individual who was the victim of the assault that had just occurred—into a dangerous arm lock, causing pain and injury to her wrists. Officer Gomez then pushed Ms. Coulter into a concrete wall.

20.    Throughout this encounter, Ms. Coulter was not combative, was not resisting, was not fleeing, was unarmed, and posed no threat to Officer Gomez or to anyone else. Ms. Coulter had screamed for help and yelled to get the assailant off her, that the assailant had assaulted her, and that she wanted to press charges against the assailant.

21.    Instead, Officer Gomez placed Ms. Coulter in handcuffs. While she was restrained in handcuffs, Officer Gomez continued to physically rough her up, shaking her left arm back forth as if trying to make her appear intoxicated, and slammed her into a brick wall a second time.

22.     Defendants Officer Fombe, Officer Cordova, Officer Goree, and Supervisor Gee arrived at the entry of Willie's. Ms. Coulter's personal belongings—including her correctional lenses, wallet, keys, and cell phone—were visible on the ground of the entryway. Ms. Coulter politely asked Officer Cordova, "Excuse me sir, can you please get my stuff?" Officer Cordova deliberately ignored her and intentionally stepped over her belongings.

23.     Supervisor Gee and Officer Goree arrived at the entryway of Willie's at the same time as Officer Cordova. Supervisor Gee directly observed Ms. Coulter with blood visibly dripping from her mouth as she had a busted lip. Ms. Coulter politely requested medical attention. Supervisor Gee responded with a condescending expression and stated words to the effect of "What for?" Ms. Coulter told Supervisor Gee that she had been assaulted. Supervisor Gee responded that "She [Ms. Coulter] can go to jail." Officer Goree replied "Yeah, she can go to the hospital after she gets out of jail." Officer Cordova clapped his hands and stated "Yeah, I think jail is where she needs to go."

24.     Supervisor Gee was advised by witnesses present at the scene that Ms. Coulter had been the target of harassment by other individuals, including at least one who was visibly intoxicated. Notwithstanding this information, Supervisor Gee took no corrective action and proceeded with Ms. Coulter's arrest.

25.     At the time of her arrest, Ms. Coulter was not engaged in any criminal activity, was not a danger to herself or anyone else, was unarmed, and was the victim of the assault that had occurred. The arrest of Ms. Coulter was without probable cause and constituted a false arrest.

26.     Because the fire alarm was triggered, Firefighter Ervin Alfonso Altamirano ("Firefighter Altamirano") responded to the scene. Supervisor Gee eventually approached Firefighter Altamirano and said "She's not injured. She's drunk. She's requesting medical

6

treatment. But can you just look at her real quick and say she's not injured?" Firefighter Altamirano briefly looked at Ms. Coulter and identified that she was bleeding from either her nose or her gums. Despite seeing that she was actively bleeding and without conducting any meaningful medical assessment, he stated she was "fine." Firefighter Altamirano ignored Ms. Coulter's repeated requests to be transported to the hospital and deferred entirely to Supervisor Gee's direction.

27.     Ms. Coulter was subsequently transported to the Jail in a patrol vehicle by Officer Gomez. During transport, Ms. Coulter again verbally requested that she be taken to the hospital. Her request was ignored.

28.     Upon arrival at the sally port of the Jail, Officer Gomez approached DO Westcott and DO Aguilera. When they asked how Ms. Coulter was, he responded "A bitch." Officer Fombe and Officer Cordova were also present at this time.

29.     As Ms. Coulter exited the patrol vehicle at the sally port, she requested her prescription correctional lenses, without which she is visually impaired. Again, she requested to be taken to the hospital as she was still bleeding.

30.     Inside the Jail, staff asked for "intake" questions, such as her name, address, and date of birth. Ms. Coulter declined to answer, which is a protected act under the Constitution. At this point, Jail staff advised that if she did not provide the information, they would conduct a punitive strip search of her.

31.     Ms. Coulter was placed in a holding cell with her hands restrained. She was without her prescription correctional lenses and was visually impaired. She repeatedly asked Jail staff for her lenses and for medical attention. All requests were ignored.

32.     Defendants DO Aguilera, DO Westcott, DO Sparks, Officer Gomez, Officer Fombe, and Officer Cordova subsequently stripped Ms. Coulter naked, laughed while doing so,

7

violated her bodily autonomy, and then left her on the jail floor while she was restrained and visually disabled.

33. While Defendants DO Aguilera, DO Westcott, DO Sparks, and Officer Fombe held the handcuffed and restrained Ms. Coulter down and strip searched her, Officer Gomez and Officer Cordova *stood just feet away watching*.

34. At one point as the officers were exiting, an officer makes a comment to the effect of "Let's call some more people in here and get a party started."

35. There was no probable cause or reasonable suspicion to conduct the strip search.

36. Prior to the strip search: (1) Ms. Coulter's person and belongings had already been searched; (2) she had no weapons or narcotics in her possession; (3) she was not arrested on suspicion of possessing or being under the influence of drugs; and (4) she was wearing clothing such that any hidden contraband would have either been clearly visible or discovered through a simple pat down.

37. Further, Ms. Coulter was strip searched during the booking process before she had intermingled with the general jail population, and she was left alone in a holding cell after the strip search.

38. Upon information and belief, the unconstitutional strip search of Ms. Coulter was consistent with longstanding policies, practices, and/or customs of the Jail/City of Stillwater, which have permitted and ratified the use of strip searches as a tool of punishment and coercion rather than as a legitimate security measure.

39. Upon information and belief, the City/Jail have subjected dozens of female detainees to unconstitutional strip searches without reasonable suspicion or probable cause. This

pattern includes, but is not limited to, the experience of Claire Hosterman, Case No. CIV-24-976-SLP, arising from substantially similar conduct.

40.     Upon information and belief, the City/Jail have a policy, practice, and/or custom of deploying strip searches against female detainees as a punitive or otherwise unauthorized measure—specifically targeting women whom officers claim are uncooperative, confrontational, or assertive of their legal rights, including but not limited to the right to remain silent, the right to medical attention, and the right to be free from unlawful arrest.

41.     Upon information and belief, the City/Jail have a policy, practice, and/or custom of permitting and directing male officers and male detention officers to conduct, participate in, or observe the strip searches of female detainees, without legitimate penological justification.

42.     As a direct and proximate result of the Defendants' conduct, actions, and/or inactions, Ms. Coulter has suffered personal injuries, medical expenses, pain and suffering, mental anguish, embarrassment, and humiliation.

**CAUSE OF ACTION:**
**VIOLATION OF THE FOURTH/FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES**

### A.  UNDERLYING VIOLATIONS

- **EXCESSIVE FORCE**

43.     Ms. Coulter hereby incorporates the allegations set forth in the previous paragraphs as if fully set forth herein.

44.     At the time of the complained of events, Ms. Coulter had a clearly established constitutional right under the Fourth Amendment to be secure in her person and free from objectively unreasonable seizure through excessive force to injure her and her bodily integrity.

45.     Any reasonable officer knew or should have known of these rights at the time of the complained of conduct as they were clearly established at that time.

46.     In the totality of the circumstances, at the time that Officer Gomez used violent force on Ms. Coulter, prior to her arrest, Ms. Coulter was: (1) unarmed; (2) not fleeing; (3) not actively resisting; and (4) posed no threat to herself, the officers, or anyone else.

47.     The use of violent force by Officer Gomez, prior to Ms. Coulter's arrest, under the circumstances described herein, was excessive and objectively unreasonable.

48.     Officer Gomez applied objectively unreasonable and excessive physical force on Ms. Coulter, thereby causing her serious bodily injuries, as well as mental pain and anguish.

49.     As a direct proximate result of Officer Gomez unlawful conduct, Ms. Coulter has suffered actual physical injuries, mental and physical pain and suffering, and other damages and losses as described herein entitling her to recover compensatory and special damages in amounts to be determined at trial.

- **UNLAWFUL STRIP SEARCH**

50.     When Ms. Coulter was taken into the care and custody of the Jail/SPD/City, a special relationship was created whereby an affirmative duty existed to ensure the protection, safety, and well-being of Ms. Coulter. Such duty existed at the time Ms. Coulter was taken into custody and extended through the entire time until she was released.

51.     At the time of the complained of events, Ms. Coulter had a clearly established right to bodily integrity.

52.     No reasonable suspicion existed that Ms. Coulter possessed any type of contraband or drugs on her person—as evidenced by the fact that the officers were not going to strip search

10

her if she asked the intake questions. Despite no reasonable suspicion existing, Defendants demanded that Ms. Coulter submit to a strip search.

53. The unwarranted, intrusive, and violent strip search, committed by Defendants DO Aguilera, DO Westcott, DO Sparks, Officer Gomez, Officer Fombe, and Officer Cordova, violated Ms. Coulter's Fourth and/or Fourteenth Amendment rights.

54. Further, the unlawful strip search was conducted in plain view of other male officers, such as DO Westcott, DO Sparks, Officer Gomez, Officer Fombe, and Officer Cordova, which violated Ms. Coulter's clearly established Fourth and/or Fourteenth Amendment rights.

55. DO Westcott, DO Sparks, Officer Gomez, Officer Fombe, and Officer Cordova had close proximity to and viewing of the unconstitutional strip search which violated Ms. Coulter's Fourth Amendment right to privacy. *See, eg., Hayes v. Marriot*, 70 F.3d 1144, 1146-47 (10th Cir. 1995); *Levoy v. Mills*, 788 F.2d 1437, 1439 (10th Cir. 1986).

56. As a proximate cause of these violations of Ms. Coulter's federally protected rights, Ms. Coulter endured pain, suffering, mental pain and anguish, humiliation, embarrassment, and the damages sought herein.

### B. MUNICIPAL LIABILITY (CITY OF STILLWATER)

57. Plaintiff hereby incorporates the allegations set forth in the previous paragraphs as if fully set forth herein.

58. The City of Stillwater is liable under 42 U.S.C. §1983 pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018 (1978), and its progeny, because the constitutional violations suffered by Ms. Coulter were caused by official policies, widespread customs, and/or practices of the City and its police and detention departments.

59.    The aforementioned violations of Ms. Coulter's Fourth Amendment right to be free from excessive force are causally connected to official policies and/or customs that the City promulgated, created, implemented, and/or bore responsibility for.

60.    Prior to Ms. Coulter's arrest and detention, the City failed to:

(a) Create, implement, and enforce proper policies and procedures relating to the use of force on detainees and arrestee, especially those like Ms. Coulter who are unarmed, not resisting, and not a danger to the safety of themselves, other officers, or anyone else;

(b) Provide proper and adequate training and supervision to SPD Officers, including but not limited to Officer Gomez, Officer Fombe, and Officer Cordova; and,

(c) Create, implement, and enforce policies relating to the use of excessive force.

61.    The City knew or reasonably should have known that persons arrested by or taken into SPD custody were subjected to, or at unreasonable risk of being subjected to, excessive force by its officers.

62.    The City knew or reasonably should have known that its use-of-force training was constitutionally inadequate and substantially certain to result in violations of detainees' rights.

63.    Upon information and belief, the City had knowledge of other detainees' verifiable complaints and claims arising from excessive force by SPD officers or detention officers, yet took no meaningful remedial action.

64.    Through its continued encouragement, ratification, and/or deliberate maintenance of these policies, customs, and practices—notwithstanding their known inadequacies and foreseeable harms—the City has acted with deliberate indifference to the constitutional rights of person in SPD custody, including Ms. Coulter.

12

65.    As a direct and proximate result of these customs, policies, and/or practices, Ms. Coulter suffered the injuries and damages as alleged herein.

66.    The City also bears Monell liability for the unconstitutional strip search of Ms. Coulter, which was not an isolated incident but instead reflects a persistent and widespread custom and practice of the City and its Jail.

67.    Upon information and belief, the City and Jail have subjected dozens of female detainees to strip searches without reasonable suspicion, probable cause, or any legitimate penological justification—a pattern that constitutes a de facto policy even in the potential absence of formal written authorization.

68.    This pattern is not incidental. Upon information and belief, SPD and Jail personnel have used strip searches as a punitive instrument against female detainees who are perceived as contentious, who assert their legal rights, or who otherwise cause officers frustration or inconvenience. Ms. Coulter was targeted for a strip search precisely because of these factors, including her exercise of the constitutional right to remain silent during the booking process.

69.    The City's pattern of unconstitutional strip searches has been the subject of prior litigation in this Court. Upon information and belief, Claire Hosterman suffered from substantially similar strip-search conduct by the City and Jail. *See* Case No. CIV-24-976-SLP (W.D. Okla.). The City knew or reasonably should have known about prior incidents and complaints, placing it on actual or constructive notice that its strip-search policies and practices were constitutionally deficient, yet the City failed to take corrective action.

70.    The City failed to adequately train and supervise Defendants DO Aguilera, DO Westcott, DO Sparks, Officer Gomez, Officer Fombe, and Officer Cordova with respect to the constitutional requirements governing strip searches, including: (a) that reasonable suspicion or

probable cause is required before strip searching a detainee who has not been integrated into the general jail population; (b) that strip searches of female detainees must be conducted by female officers; and (c) that male officers are prohibited from conducting, participating in, or observing the strip searches of female detainees.

71.    The City knew or reasonably should have known that its strip-search training was constitutionally inadequate and substantially certain to result in violations of detainees' rights, including violations of the kind Ms. Coulter was forced to endure.

72.    Through its continued encouragement, ratification, approval, and/or deliberate maintenance of the strip-search policies, customs, and practices described herein—notwithstanding their known constitutional deficiencies and the prior actual or constructive notice—the City has acted with deliberate indifference to the dignity, safety, and constitutional rights of female detainees in its custody, including Ms. Coulter.

73.    As a direct and proximate result of these customs, policies, and/or practices, Ms. Coulter suffered the injuries and damages as alleged herein.

WHEREFORE, based on the foregoing, Plaintiff Alicia D. Coulter prays this Court grant the relief sought, including but not limited to actual and compensatory damages, and punitive damages, in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

DATED this 10th day of April, 2026.

Respectfully submitted,


 /s/ Matthew J. Primm
Matthew J. Primm, OBA No. 33589
Haven Law Group
1874 S. Boulder Ave.
Tulsa, OK 74119
T: (918) 796-5738
F: (918) 796-5724
mprimm@havenlg.com
*Attorney for Plaintiff*